IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

AIRPORT CONCESSION CONSULTING
SERVICES, LLC, and PATRICK GLEASON,

    Plaintiffs,

v.

SENTINEL INSURANCE COMPANY, LTD,

    Defendant.

No. 3:17-cv-01666-HZ-1

OPINION & ORDER

Michael E. Farnell
W. Blake Mikkelsen
Parsons Farnell & Grein, LLP
1030 SW Morrison Street
Portland, Oregon 97205

    Attorneys for Plaintiffs

Francis J. Maloney, III
Maloney Lauersdorf & Reiner, PC
1111 E. Burnside Street, Suite 300
Portland, Oregon 97214

    Attorneys for Defendant

HERNÁNDEZ, District Judge:

    This matter comes before the Court on the parties' Cross-Motions for Summary Judgment. ECF 16, 17. For the reasons that follow, the Court grants Plaintiffs' Motion for Summary Judgment [17] and denies Defendant's Cross-Motion for Summary Judgment [16].

1 – OPINION & ORDER

# FACTUAL BACKGROUND

Plaintiffs Airport Concession Consulting Services ("ACCS") and Patrick Gleason bring this action against Defendant Sentinel Insurance Company alleging Defendant breached its insurance contract with Plaintiffs when it declined to defend Plaintiffs in an underlying lawsuit in California state court.

The plaintiff in the underlying lawsuit, Diego Concession Group ("DCG"), alleged the San Diego County Regional Airport Authority issued a request for proposals ("RFP") on February 2, 2011, for food service and retail concessions at San Diego County Regional Airport. The Airport Authority hired Plaintiffs in this case, ACCS and Gleason, to provide consulting services; to prepare the RFP, accompanying materials, and the criteria for evaluation of the proposals; to conduct the evaluation of the proposals submitted; and to assist the Airport Authority in making the final decisions as to which proposals to accept.

DCG submitted a proposal in response to the RFP. In July 2011 the Airport Authority informed DCG that its proposal had not been selected, but that a second RFP regarding food service and retail concessions at the airport was forthcoming. After the Airport Authority issued that second RFP, DCG submitted another proposal. The Airport Authority again did not select DCG's proposal.

On December 19, 2012, DCG filed a lawsuit stemming from the rejections of their proposals in which Gleason was named as a defendant. On June 5, 2013, DCG amended its complaint in the underlying lawsuit to add claims and to name ACCS as a defendant.

On October 25, 2013, Plaintiffs tendered to Defendant their defense in the underlying lawsuit. Together with the October 25, 2013, letter, Plaintiffs sent to Defendant the then-operative first amended complaint and a proposed (but not yet filed) second amended complaint.

On December 11, 2013, DCG filed its second amended complaint in the underlying lawsuit. That second amended complaint was the same in all material respects as the proposed second amended complaint that Plaintiffs sent to Defendant. On January 25, 2014, counsel for Plaintiffs informed Defendant that the second amended complaint had been filed and was then the operative complaint in the underlying lawsuit. By letter dated January 31, 2014, Defendant denied coverage for Plaintiffs' defense in the underlying lawsuit.

In the second amended complaint DCG alleged the Airport Authority hired ACCS and Gleason as independent consultants to assist with the RFP and proposal-selection process as follows:

> [P]reparation of the concessions RFP and second RFP, the preparation of RFP materials that would be disseminated to the public for bidding purposes; the preparation of criteria for evaluation of RFP submissions; the actual evaluation of RFP submissions; the provision of information to the Authority evaluation panel so that the latter could make decisions as to qualifications of RFP bidders; and consultation with Authority Board Members, staff and evaluation panel members to facilitate decisions concerning the RFPs.

Joint Stipulated Facts and Exhibits [15] Ex. 7, ¶ 32. DCG further alleged Gleason and ACCS engaged in the following improper conduct:

> (1) Improperly communicating with other RFP bidders while the first concessions RFP was still pending;
>
> (2) Representing to prospective bidders and the general public that the RFP process would be transparent, fair, impartial, free from personal financial gain, and consistent with the standards identified in paragraphs 18 through 28 above, whereas in fact Gleason and ACCS acted in a manner that would maximize the potential benefit to Gleason and his future employer, SSP America;
>
> (3) Misrepresenting and misstating the qualifications of DCG to Authority officers, employees, consultants and evaluation panel members, including false statements to the foregoing that Plaintiff DCG was not qualified financially, did not properly respond to the Authority's request for financial information, was "nonresponsive" and did not meet the RFP's minimum qualifications when, in fact, DCG was responsive and met such qualifications;

(4) Engaging in other conduct that violated public contracting and bidding statutes, and Authority codes, by not being impartial, independent, and fair and because Gleason and ACCS were undertaking actions aimed at maximizing the award of contracts to Gleason's future employer, SSP America.

*Id.* Ex. 7, ¶ 34. In addition, DCG alleged Gleason took a job with the largest winning bidder, SSP America, "just weeks" after Gleason's consulting work with the Airport Authority concluded, and that Gleason intentionally "misevaluated" DCG's proposal in order to benefit SSP America. *Id.* Ex. 7, ¶¶ 25–27.

DCG brought several claims against Plaintiffs. First, DCG brought a claim for negligent misrepresentation on the basis that Plaintiffs made false statements to DCG regarding (1) limitations on communications between the Airport Authority and other parties involved in the RFP process, and (2) the fairness and transparency of the RFP process. Second, DCG brought a claim against Plaintiffs for fraud on the basis of their statements to DCG concerning the RFP process. Third, DCG brought a claim against Plaintiffs for trade libel on the basis of their statements to the Airport Authority that DCG did not meet minimum qualifications, did not respond to requests for financial information, and was not financially responsive. Fourth, DCG brought a claim against Plaintiffs for intentional interference with prospective economic advantage on the basis that Plaintiffs intentionally interfered with the relationship between DCG and the Airport Authority. Fifth, DCG brought a claim for negligent interference with prospective economic advantage on largely the same basis. Sixth, DCG brought a claim for unfair competition against Plaintiffs on the basis that Plaintiffs' actions violated California Business & Professions Code § 17200.

On September 15, 2017, Plaintiffs filed this case in the Circuit Court of the State of Oregon in Clackamas County alleging Defendant breached its insurance contract with Plaintiffs when it declined to provide a defense to Plaintiffs in the underlying lawsuit. On October 20,

4 – OPINION & ORDER

2017, Defendant removed the case to this Court on the basis of diversity jurisdiction under 28 U.S.C. § 1332(a)(1).

STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support

his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

The parties agree the substantive law of the State of Oregon applies to whether Defendant had a duty to defend Plaintiffs in the underlying lawsuit. The Court agrees and finds Oregon substantive law applies.

As noted, Plaintiffs contend Defendant had a duty to defend them in the underlying lawsuit. Defendant, on the other hand, contends it did not have a duty to defend because (1) the insurance policy does not cover any alleged conduct in the underlying lawsuit; (2) even if Plaintiffs establish coverage in the first instance, the allegations in the underlying lawsuit fall within a coverage exclusion in the insurance policy; and (3) Plaintiffs did not satisfy their obligation to send to Defendant a copy of the second amended complaint after it was filed.

**I.     Duty to Defend Under Terms of the Insurance Policy**

"An insurer's duty to defend, according to the widely accepted 'four-corners' rule, is determined by comparing the complaint to the insurance policy." *W. Hills Dev. Co. v. Chartis Claims, Inc.*, 385 P.3d 1053, 1055, 360 Or. 650, 653 (2016). "If the allegations in the complaint assert a claim covered by the policy, then the insurer has a duty to defend." *Id.* "First, the court must determine whether the complaint contains allegations of covered conduct. If it does . . . then the insurer has a duty to defend, even if the complaint also includes allegations of excluded conduct." *Abrams v. Gen. Star Indem. Co.*, 67 P.3d 931, 935, 335 Or. 392, 400 (2003). In order for the duty to defend to be triggered, the complaint must "without amendment" permit proof of a covered offense. *Abrams*, 67 P.3d at 934, 335 Or. at 398–99. Thus, "an insurer has a duty to defend if allegations in a complaint, even if identified as a single claim for relief, in fact state

more than one claim for relief, at least one of which is for conduct covered by the policy." *Abrams*, 67 P.3d at 934, 335 Or. at 397–98. "By limiting the analysis to the complaint and the insurance policy, the four-corners rule generally prevents consideration of extrinsic evidence." *W. Hills Dev. Co.*, 385 P.3d at 1055, 360 Or. at 653.

The insured bears the burden to prove coverage under the insurance policy in the first instance. *ZRZ Realty Co. v. Beneficial Fire and Cas. Ins. Co.*, 241 P.3d 710, 716, 349 Or. 117, 127 (2010). If the insured carries its burden of proving coverage exists under the insurance policy, the insurer then bears the burden to prove an exclusion from coverage applies. *Id.*

"Interpretation of an insurance policy is an issue of law." *Hunters Ridge Condo. Ass'n v. Sherwood Crossing, LLC*, 395 P.3d 892, 896, 285 Or. App. 416, 422 (2017). "The overriding goal in construing an insurance policy is to 'ascertain the intention of the parties.'" *Id.* (quoting *Dewsnup v. Farmers Ins. Co. of Or.*, 239 P.3d 493, 496–97, 349 Or. 33, 39-40 (2010)). The court "determine[s] the intention of the parties by analyzing the policy's express terms and conditions." *Hunters Ridge Condo. Ass'n*, 395 P.3d at 896, 285 Or. App. at 422; *see also Hoffman Constr. Co. of Ak. v. Fred S. James & Co. of Or.*, 836 P.2d 703, 706, 313 Or. 464, 469 (1992). The terms of an insurance policy are to be interpreted according to the "'understanding of the ordinary purchaser of insurance.'" *Hunters Ridge Condo. Ass'n*, 395 P.3d at 896, 285 Or. App. at 422 (quoting *Congdon v. Berg*, 299 P.3d 588, 597, 256 Or. App. 73, 87 (2013)). If an insurance policy provides a definition for a particular term, the court must apply that definition. *Hunters Ridge Condo. Ass'n*, 395 P.3d at 897, 285 Or. App. at 422. "When, on the other hand, a particular word or phrase is not defined in a policy, [the court] first look[s] to whether the word or phrase has a plain meaning—*i.e.*, the word or phrase 'is susceptible to only one plausible interpretation.'" *Id.* (quoting *Holloway v. Republic Indem. Co. of Am.*, 147 P.3d 329, 334, 341

Or. 642, 650 (2006)). "If the word or phrase has more than one plausible interpretation, [the court] then 'examine[s] the phrase in light of the particular context in which [it] is used in the policy and the broader context of the policy as a whole.'" *Hunters Ridge Condo Ass'n*, 395 P.3d at 897, 285 Or. App. at 422–23 (quoting *Holloway*, 147 P.3d at 334, 341 Or. at 650). "If, after examining the word or phrase in that context, the ambiguity persists—*i.e.*, two or more plausible interpretations remain—'any reasonable doubt as to the intended meaning of such a term will be resolved against the insurance company.'" *Hunters Ridge Condo Ass'n*, 395 P.3d at 897, 285 Or. App. at 422–23 (quoting *Holloway*, 147 P.3d at 334, 341 Or. at 650).

### A. Coverage

Plaintiffs, as the insureds, bear the burden to prove the allegations in the underlying lawsuit are covered under the insurance policy in the first instance. *ZRZ Realty Co.*, 241 P.3d at 716, 349 Or. at 127. The insurance policy between Plaintiffs and Defendant was a business liability coverage agreement that broadly provided:

> We [the insurer] will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage" or "personal and advertising injury" to which this insurance does not apply.

Joint Stipulated Facts and Exhibits (#15-1), Ex. 1 at 16. As relevant to this case, the policy defines "personal and advertising injury" as "injury, including consequential 'bodily injury', arising out of one or more of the following offenses: . . . Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." *Id.* at 37–38.

Plaintiffs contend DCG's trade libel and interference with prospective economic advantage claims contain allegations that fall within the scope of the definition of "personal and

advertising injury." In particular, as the basis for coverage Plaintiffs rely on DCG's allegations that Plaintiffs misrepresented DCG's proposal, financial qualifications, and responsiveness to the Airport Authority. Notably, Plaintiffs do not rely on the other allegations in the underlying complaint concerning, for example, misrepresentations to bidders and improper communications with other bidders.

Defendant contends in summary fashion that the allegations in the underlying lawsuit do not fall within the definition of "personal and advertising injury," and, therefore, the insurance policy does not impart on Defendant a duty to defend Plaintiffs. As noted, in the underlying lawsuit DCG brought a claim of trade libel against Plaintiffs on the basis of their statements to the Airport Authority that DCG did not meet minimum qualifications, did not respond to requests for financial information, and was not financially responsive. DCG's interference with prospective economic advantage claims were based in part on the same basis.

The only conceivable basis on which to find coverage does not exist for the relevant allegations in the underlying lawsuit is that the conduct alleged does not constitute "publication" within the meaning of the insurance policy. "Publication" is not defined in the policy. As relevant here, the dictionary defines "publication" as "communication (as of news or information) to the public," a "public announcement," a "proclamation," or a "legal notification." *Webster's New Int'l Dictionary* 1836 (3d ed. 2002). The alleged conduct arguably does not fit within the dictionary definition of "publication" because the allegedly libelous statements and representations were made only to the Airport Authority's staff, consultants, and evaluation panel members, and not to the public at large. How broadly a statement or communication of information must be broadcast in order to qualify as "publication," however, is not altogether clear from the dictionary definition. Because "publication" as used in the policy has more than

9 – OPINION & ORDER

one plausible interpretation, the Court must look to the context in which that term is used in the insurance policy. *See Hunters Ridge Condo Ass'n*, 395 P.3d at 897, 285 Or. App. at 422–23 (quoting *Holloway*, 147 P.3d at 334, 341 Or. at 650).

In this instance, the context of the usage of the term "publication" indicates the parties intended that word to take on a broad meaning. The insurance policy uses the term "publication" in connection with material that could be actionable under reputational torts like libel and slander. In the context of reputational torts, "'publication or communication of the defamatory statement is an essential element of an action for defamation.' In general, a statement is published when it is communicated to a third party." *Lansford v. Georgetown Manor, Inc.*, 84 P.3d 1105, 1111, 192 Or. App. 261, 269 (2004)(quoting *Wallulis v. Dymowski*, 918 P.2d 755, 758, 323 Or. 337, 342–43 (1996)). The legal definition of the word "publication" in the context in which it is used in the insurance policy, therefore, is broader than at least a narrow construction of the dictionary definition of the term. Because the context of the policy indicates the parties intended to use the word "publication" as understood in the context of reputational torts, the Court concludes the most natural reading of that term in the insurance policy is that it applies to any alleged communication of material that may constitute libel or slander to any third party. Even if any ambiguity remained about this point after examination of the plain meaning and context, the Court would be compelled to construe the term "publication" against the insurer and adopt the broader definition. The Court, therefore, finds the relevant allegations in the underlying lawsuit clearly fall within the scope of coverage in the definition of "personal and advertising injury."

### B. Testing or Consulting Errors and Omissions Exclusion

Defendant alternatively contends the allegations in the underlying lawsuit fall entirely within the testing or consulting errors and omissions exclusion in the insurance policy. That exclusion provides:

EXCLUSION – TESTING OR CONSULTING ERRORS AND OMISSIONS

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:

1. An error, omission, defect or deficiency in:

    a. Any test performed; or

    b. An evaluation, a consultation or advice given,

    by or on behalf of any insured;

2. The reporting of or reliance upon any such test, evaluation, consultation or advice; or

3. The rendering of or failure to render any service by you or on your behalf in connection with the selling, licensing, franchising or furnishing of your computer software to others including electronic data processing programs, designs, specifications, manuals and instructions.

Joint Stipulated Facts and Exhibits (#15-1), Ex. 1 at 40. Defendant contends the conduct alleged in the underlying lawsuit falls under the first or second subparts of the testing or consulting errors and omissions exclusion.

#### 1. *Subpart One: Errors and Omissions*

In order for the alleged conduct to fall under the first subpart of the errors and omissions exclusion, all relevant conduct alleged in the underlying lawsuit must "aris[e] out of" (1) "[a]n error, omission, defect or deficiency" in (2) "[a]ny test performed" or "[a]n evaluation, a consultation or advice given" (3) by or on behalf of the insured.

11 – OPINION & ORDER

The parties focus their analysis on DCG's trade libel claim against Plaintiffs. Under California law, trade libel, as alleged against Plaintiffs in the underlying lawsuit, "is an intentional disparagement of the quality of services or product of a business that results in pecuniary damage to the plaintiff." *J-M Mfg. Co., Inc. v. Phillips & Cohen LLP*, 247 Cal. App. 4th 87, 97, 201 Cal. Rptr. 3d 782, 790 (Cal. Ct. App. 2016). "[T]rade libel requires a false statement of fact, not an expression of an opinion." *Id.* To establish a claim of trade libel, "the statement must be made with actual malice, that is, with knowledge it was false or with reckless disregard for whether it was true or false," and that as a result the plaintiff "actually suffered some pecuniary loss." *Id.*

As noted, the crux of DCG's trade libel claim was that ACCS and Gleason:

> Misrepresent[ed] and misstat[ed] the qualifications of DCG to Authority officers, employees, consultants and evaluation panel members, including false statements to the foregoing that Plaintiff DCG was not qualified financially, did not properly respond to the Authority's request for financial information, was "nonresponsive" and did not meet the RFP's minimum qualifications when, in fact, DCG was responsive and met such qualifications.

Joint Stipulated Facts and Exhibits [15] Ex. 7, ¶ 34. DCG alleged the misrepresentations and misstatements "deterred the Authority from awarding contracts to DCG. As a consequence of the conduct of ACCS and Gleason, Plaintiff DCG lost out on potential contracts with the Authority which it anticipates to exceed $1,000,000." *Id.* Ex. 7, ¶ 65. With respect to Plaintiffs' intent, DCG alleged in the course of a request for punitive damages:

> The publication of the statements was motivated by Defendant's fraud, malice and oppression in that it subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights and in that it contained an intentional misrepresentation and concealment of a material fact known to these Defendants with the intention on the part of these Defendants of thereby depriving Plaintiff DCG of legal rights or otherwise causing injury, as set forth above.

*Id.* Ex. 7, ¶ 66.

DCG, therefore, alleged Plaintiffs made intentional, material misrepresentations to the Airport Authority about DCG's proposal. In the context of the entirety of the underlying complaint, it is clear DCG alleged Plaintiffs made these misrepresentations in order to benefit SSP America, Gleason's future employer whom the Airport Authority selected to win the largest share of the bids.

Although some of the alleged relevant conduct that could support a claim for trade libel may fall within the first subpart of the errors and omissions exclusion, not all of the alleged conduct arises out of an "error, omission, defect or deficiency." As used in the exclusion, each of the words "error," "omission," "defect," and "deficiency" indicate that the exclusion applies to negligent or mistaken conduct in the course of a test performed or advice or consultation given. The allegations in the underlying lawsuit, however, clearly implicated intentional misconduct in the course of the consulting work that Plaintiffs performed. Such intentional misconduct does not fall within the definitions of "error," "omission," "defect," or "deficiency" as those words are used in the insurance policy.[1]

On this record, therefore, the Court concludes the relevant allegations in the underlying lawsuit do not entirely fall under the first subpart of the testing or consulting errors and omissions exclusion.

---

[1] Plaintiffs invite the Court to consider extrinsic evidence in support of its contention that the "errors and omissions" clause does not exclude coverage for claims of reputational torts. In particular, Plaintiffs contend "errors and omissions" is a term of art, and, therefore, the Court should consider extrinsic evidence like statements on Defendant's website in determining whether the "errors and omissions" clause excludes coverage in this case. The Court need not determine whether it is appropriate to consider the extrinsic evidence, however, because it concludes the plain meaning of the "errors and omissions" clause does not relieve Defendant of its duty to defend.

2. *Subpart Two: Reporting of or Reliance upon a Test, Evaluation, Consultation, or Advice*

As noted, the testing or consulting errors and omissions exclusion also provides: "This insurance does not apply to 'bodily injury', 'property damage' or 'personal and advertising injury' arising out of . . . [t]he reporting of or reliance upon any such test, evaluation, consultation or advice." It is clear the allegations in the underlying lawsuit do not implicate Plaintiffs' or DCG's "reliance upon" any test, evaluation, consultation, or advice because Plaintiffs allegedly performed the evaluation and gave the consultation or advice to the Airport Authority. Accordingly, in order for the errors and omissions exclusion to apply, the entirety of the relevant allegations in the underlying lawsuit must qualify as arising out of the "reporting of . . . any such test, evaluation, consultation or advice." The parties do not interpret this provision, and it does not appear there is any caselaw specifically addressing this portion of the errors and omissions exclusion.

The Court finds the use of the word "such" indicates the second subpart excludes coverage for liability that stems from the reporting of or reliance upon a "test, evaluation, consultation or advice" that contains an "error, omission, defect or deficiency." In the second subpart, "such" serves as a shorthand reference to "error, omission, defect or deficiency" as set out fully in the first subpart. Whereas the first subpart excludes from coverage liability that arises out of mistakes made in the analysis or testing that leads up to the reporting of the results of the test or evaluation, the second subpart excludes from coverage liability that arises out of the reporting of or reliance upon the mistaken test, evaluation, consultation, or advice.[2] The

---

[2] An alternative interpretation could be that the second subpart excludes coverage of liability that arises from the reporting of or reliance upon any test performed or evaluation, consultation, or advice given. Although under this interpretation the second subpart would exclude coverage for liability arising from mistaken or intentional conduct, this possible alternative interpretation does

14 – OPINION & ORDER

allegations in the underlying lawsuit, therefore, are not excluded for the same reason as in subpart one; *i.e.*, at least some of the alleged conduct in the underlying lawsuit stems from intentional misconduct, and not from any alleged "error, omission, defect or deficiency."

Accordingly, on this record the Court concludes the errors and omissions exclusion does not relieve Defendant of the duty to defend Plaintiffs in the underlying lawsuit.

## II. Failure to Provide Notice of Second Amended Complaint

Defendant finally contends it did not have a duty to defend Plaintiffs in the underlying lawsuit because Plaintiffs did not sufficiently give Defendant notice of the filing of the second amended complaint.

As noted, on October 25, 2013, Plaintiffs tendered to Defendant their defense in the underlying lawsuit. Plaintiffs sent to Defendant the then-operative first amended complaint in the underlying lawsuit and a proposed (but not yet filed) second amended complaint together with that letter. On December 11, 2013, DCG filed its second amended complaint in the underlying lawsuit. On January 25, 2014, counsel for Plaintiffs informed Defendant that the second amended complaint had been filed and was at that time the operative complaint in the underlying lawsuit. The second amended complaint that DCG filed on December 11, 2013, was similar in all material respects to the proposed second amended complaint that Plaintiffs sent to Defendant on October 25, 2013. By letter dated January 31, 2014, Defendant denied coverage for Plaintiffs' defense in the underlying lawsuit.

Defendant contends Plaintiffs' failure to timely provide it with a copy of the second amended complaint in the underlying lawsuit constitutes an independent basis on which to deny

---

not help Defendant because it only creates an ambiguity that the Court would be required to resolve in Plaintiffs' favor. *See Hunters Ridge Condo Ass'n*, 395 P.3d at 897, 285 Or. App. at 422–23 (quoting *Holloway*, 147 P.3d at 334, 341 Or. at 650).

15 – OPINION & ORDER

coverage. "Notice of the claim is a condition precedent to the duty to defend." *Oregon Ins. Guar. Ass'n v. Thompson*, 760 P.2d 890, 893, 93 Or. App. 5, 11 (1988). In determining whether it has a duty to defend, an insurer must generally only consider the complaint that has been filed at the time that the insured tendered the claim to the insurer. S*ee W. Equities, Inc. v. St. Paul Fire and Marine Ins. Co.*, 56 P.3d 431, 432 n.1, 184 Or. App. 368, 370 n.1 (2002).

In this case, however, Plaintiffs attached the proposed second amended complaint to the October 25, 2013, tender letter together with a statement advising Defendant that counsel for DCG indicated DCG anticipated filing the second amended complaint. After DCG filed a second amended complaint that was materially similar to the proposed second amended complaint that Plaintiffs sent to Defendant, Plaintiff notified Defendant of that filing on January 25, 2014, six days before Defendant sent the letter denying coverage. Defendant, therefore, was aware of the substance of the second amended complaint on October 25, 2013, and was on notice that the second amended complaint had been filed before Defendant issues its coverage determination.

On this record, the Court concludes Plaintiffs provided Defendant with adequate notice of the second amended complaint.

## CONCLUSION

For these reasons, the Court grants Plaintiffs' Motion for Summary Judgment [17] and denies Defendant's Cross-Motion for Summary Judgment [16].

IT IS SO ORDERED.

DATED this 6 day of June, 2018.

_____
MARCO A. HERNÁNDEZ
United States District Judge